Estate of Clare W. Kyler, deceased, GladysR. Kyler, Administratrix, and Gladys R. Kyler, Surviving Spouse v. Commissioner.
Estate of Kyler v. Commissioner
Docket No. 5580-69.
United States Tax Court
T.C. Memo 1971-308; 1971 Tax Ct. Memo LEXIS 23; 30 T.C.M. (CCH) 1319; T.C.M. (RIA) 71308; December 7, 1971, Filed *23 John Kennedy Lynch, 907 East Ohio Bldg., Cleveland, Ohio for the petitioners. Frank E. Wrenick, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in Federal income tax and additions to tax for the joint returns of Clare W. Kyler, deceased, and Gladys R. Kyler for the calendar years 1958 through 1964 as follows: Addition to tax
Year
Deficiency
Sec. 6653(b)
1958
$1,537.04
$ 768.52
1959
2,474.77
1,237.39
1960
3,136.74
1,568.37
1961
3,215.93
1,607.97
1962
3,356.19
1,678.10
1963
3,246.39
1,623.20
1964
3,017.30
1,508.65
The parties have stipulated that during 1958 through 1963 certain amounts of income were received and were not reported on the appropriate income tax returns. The remaining issues are (1) whether income in addition to that stipulated was received by Clare W. Kyler in the form of bribes and was not reported on the appropriate tax return; (2) whether any part of the underpayment of tax in any of the subject years was due to fraud with intent to evade tax, and (3) whether assessment of any deficiencies determined for the years 1958 and 1959 is *24 barred by the statute of limitations. Findings of Fact Certain facts have been stipulated; the stipulations of fact and the exhibits attached thereto are incorporated herein by reference. Gladys R. Kyler, hereinafter Gladys, or petitioner, was a legal resident of Mansfield, Ohio, at the time the petition was filed. She and her husband, Clare W. Kyler, deceased, hereinafter Kyler, filed joint Federal income tax returns for the years at issue with the district director of internal revenue, 1320 Cleveland, Ohio. Kyler died in 1966 and Gladys was duly appointed administratrix of his estate. Kyler was a member of the Mansfield, Ohio police department from 1930 through the years at issue and until approximately the time of his death in 1966. Kyler was a captain for several years and on November 1, 1958 was appointed chief of police and served in that capacity throughout the years at issue. Kyler passed examinations for all posts he held on the police force and achieved the highest score of the three examinees for the post of chief of police. For the years 1958 through 1962, petitioners filed joint income tax returns on "short" Form 1040A and reported Kyler's salary which ranged *25 from $5,111 in 1958 to $7,240 in 1962. For the years 1963 and 1964, petitioners used the regular Form 1040 and reported income as follows: 1958
1959
1960
1961
1962
1963
Interest credited to jojnt savings accounts
$24.93
$68.93
$179.75
$100.56
$174.18
Interest received on time certificate of deposit
68.00
68.00
68.00
68.00
238.00
Interest received on property loan to Frye
156.90
298.47
$100.71
Interest from Mansfield Municipal Credit Union
7.32
Executor's fee received by Kyler from Grace Kyler estate
303.50
Total
92.93
136.93
247.75
628.96
717.97
100.71
1963
1964
Salary
$7,552.02
$7,950.15
Interest
428.14
436.29 Petitioners claimed the standard deduction on their 1963 and 1964 joint returns, listing no itemized deductions. Income earned but not reported on petitioners' joint income tax returns was as follows: The property loan to Frye from which the interest shown above was earned but not reported was $5,000 and was the result of a sale to Frye of property inherited by Kyler in 1961 from the estate of Grace Kyler, Kyler's mother. Following receipt in 1961 of the *26 executor's fee shown above from Grace Kyler's estate, the money was divided between Kyler's sister's two sons as a result of an argument with his sister over the disposition of the estate. At the time of Kyler's death in 1966 he owned the following assets: Appraised
value
Cash in checking account personal effects
$ 262.81
Cash in savings account
1,073.15
Cash on deposit with credit union
1,640.03
Money due from employer
214.48
Time certificates
9,600.00
Mining stock
180.00
Auto
2,600.00
Boat and motor
2,200.00
Movable lake cottage
1,400.00
Real estate:
Residence
$12,500.00
Vennum Avenue house
10,000.00
Brevard County, Fla.
250.00
Lee County, Fla.
1,000.00
Erie County, Ohio
250.00
Huron, Ohio 260.00
Total real estate 24,260.00
Total estate
$43,457.47
The residence shown above was purchased in 1935; and the Vennum Avenue property shown above was purchased in October 1959 for $7,500 and was paid for by a $700 down payment and a $6,800 mortgage. For a substantial portion of the period from October 1959 through the end of 1964, one or the other of petitioners' daughters occupied the Vennum Avenue *27 property rent free. The boat shown above was purchased for $2,500 in 1962 and was kept at the South Shore Marina dock on Lake Erie. Kyler handled the family monetary affairs without confiding in his wife to any 1321 substantial degree, giving Gladys a $40 weekly allowance for the purchase of groceries. During the year 1958, petitioner and Kyler supplied all of the support of their daughter Sandra-Sue. During the years 1961 through 1963, petitioner and Kyler supplied all the support for their granddaughter who lived with them. During the years at issue, the Kylers traded in their auto three times in each case for a new Pontiac. Although the joint tax return for each of the years at issue was signed by Gladys, Kyler prepared each of the returns at issue himself without consultation with Gladys. On the evening of December 24, 1964, Chris W. Drye, hereinafter Drye, telephoned John Relic, hereinafter Relic, who was a special agent for the Internal Revenue Service. Drye operated gambling, vice, numbers, and prostitution businesses in Mansfield, Ohio, continuously from 1937 through December 1964, at which time the arrest of one of Drye's numbers runners and Drye's accumulated debts *28 forced Drye out of business and subsequently into bankruptcy. In the phone conversation and in later meetings with Relic, Drye stated that he had paid bribes to Kyler and to several others on the Mansfield police force for several years, including each of the years now at issue, for the purpose of continuing his illegal businesses without interference. The alleged bribes claimed in respondent's notice of deficiency to have been received by Kyler were as follows: 1958
$ 7,200
1959
10,000
1960
12,000
1961
12,000
1962
12,000
1963
12,000
1964
12,000
Ultimate Findings of Fact 1. Kyler was not paid bribes by Drye during any of the years at issue. 2. The omissions from petitioner's and Kyler's joint income tax returns of interest income and the executor's fee from the estate of Grace Kyler were not the result of fraud with the intent to evade tax. Opinion The principal issues are the ultimate question of Kyler's receipt of bribes and the existence of fraudulent intent to avoid taxes either regarding the alleged bribes or regarding the interest income and executor's fees which admittedly were received but not reported. However, a preliminary question *29 must first be disposed of. That is the acceptability as evidence of information contained on a worksheet prepared by Relic amounting to a comparative net worth computation of petitioner and Kyler's assets and liabilities for each year from 1958 through 1964. Respondent has made no effort to independently prove the facts asserted on Relic's worksheet. Respondent argues that the information contained on the worksheet amounts to an admission by silence; this contention is based on the following facts. On December 3, 1965, Relic visited Kyler in Kyler's office, accompanied by another revenue agent and carrying a pencil version of the typed worksheet now offered in evidence. On a previous occasion Relic had informed Kyler of the charges of bribery, the tax implications, and of Kyler's right to remain silent and his right to have a lawyer present. At the beginning of the December 3, 1965, meeting, Relic again informed Kyler of his constitutional rights of silence and counsel. Then, as testified to by Relic: "At that time we had already computed a net worth schedule, and we went over this net worth schedule to [sic] Chief Kyler item by item. And he made no objections to the item until *30 he asked of the liabilities. That was quite a lengthy conference, and we talked about items and amounts." Since the worksheet was admitted as evidence for the limited purpose of tending to prove that there was an admission, the paper serves no more than as evidence of what Relic's allegations to Kyler might have been; the worksheet is not independent evidence of the fact of admission, by silence or otherwise. Relic's testimony is inconclusive of such an admission for the following reasons. First, we are not told by Relic whether Kyler was shown the amounts on the worksheet, or was made aware of the specific amounts in each column and on each line. Relic said simply that he and his assistant "went over" the statement with Kyler "item by item." This may be interpreted as meaning that Relic merely asked Kyler what the appropriate amount should be for each line item on the worksheet. Second, Relic did not testify that Kyler made no objections during the entire meeting, but rather that Kyler made no objections until the time that the discussion reached Kyler's liabilities. We are left in the dark as to whether objections were made after that point, and whether objections at that stage *31 were limited only to liabilities or referred back to assets. This Court is unwilling to find from Relic's testimony an admission by Kyler of 1322 each of the figures contained on the worksheet; at that stage, the sheet was filled out in pencil and had some 34 lines and 8 columns of numerical data, not counting the profusion of line descriptions, subtotals, totals, and marginal references to numbered and lettered exhibits indicating detail figures supporting many of the worksheet amounts, which detail figures, so far as shown, were not seen by Kyler. The mere presence of a column of comprehensive exhibit references indicates information and evidence in respondent's hands which could have been used as direct evidence presented to this Court but was not. We come now to the allegation by Drye that he paid bribes to Kyler in each of the years in question. Drye's statements are unsupported by any relevant evidence. Based on the whole record, we find Drye's statements unconvincing. We are mindful of the fact that there are two burdens of proof involved in the alleged receipt of bribes. As regards penalties under section 6653(b), respondent must prove the requisite fraudulent intent, *32 and consequently in this connection, the receipt of the bribes, by clear and convincing evidence, each year to be considered independently. and cases cited therein. With regard to the deficiency itself, respondent is presumptively correct and petitioner must convince us of the error of respondent's notice of deficiency. However, the evidence necessary for petitioner to meet her task need not necessarily be adduced by petitioner but may be found in the totality of the facts and circumstances of record. See . Considering the whole record, we find by a preponderance of the evidence that bribes were not paid by Drye to Kyler during any of the years at issue. This determination is factual and depends inherently on the credibility of the testimony of several conflicting witnesses determined both from the consistency of their words and from their demeanor. No useful purpose would be served by cataloging each nuance of the evidence adduced by both parties. However, the following are some of the significant inconsistencies between Drye's testimony and the other evidence *33 existent in the record which have lead to the above result. It was Drye's contention that from June of 1958 to October 1958, Drye made payments of $600 to Kyler each month on behalf of Drye's brother who was in the "numbers" business. In November 1958, when Kyler became chief of police, Drye's alleged payment on behalf of his brother became $1,000 per month, continuing until June 1959, the time of the death of Drye's brother. Drye then contends that he acquired his brother's illegal activities and developed some activities of his own and continued the payment of $1,000 per month to Kyler until March of 1964 when Drye claimed he was financially unable to continue. However Kyler's assets (or lack thereof) existent at the time of Kyler's death in 1966 as evidenced by the uncontradicted estate inventory used for probate purposes, belie the receipt of such large sums, totaling $77,200, in unreported bribes from 1958 through 1964. The assets owned by Kyler at his death, excluding the residence which was purchased prior to the years in question and excluding the $5,000 received from Frye as a result of the sale of inherited property, had an approximate cost of $22,457. Of course, it would *34 be unreasonable to assume all of those assets were acquired since the beginning of 1958, but even if such an assumption were made, the total accumulation divided by the number of years from 1958 through mid-1966, the time of Kyler's death, amounts to an annual accumulation of approximately $2,640. Such an amount is not excessive or unexplainable since Kyler's home was paid for, he supported only himself, his wife, and granddaughter and lived relatively frugally. Drye claims the cause of the demise of his "businesses" was the arrest of one of his numbers runners in late 1964, even though another numbers "pick-up man" employed by Drye was arrested in 1962, an event apparently not affecting Drye's business at that time. Drye claims the payoffs drove him to borrowing huge sums at the bank. An examination of Drye's bank borrowings show the borrowings began before the alleged large bribes began in 1959; the borrowing of new money, as opposed to renewing or consolidating old loans, and except for one loan in 1964, was confined principally to the period of August 1960 through September 1961, 3 years before the weight of the alleged bribes allegedly caused Drye's financial downfall; Drye's *35 tax returns and his 1323 testimony indicate that he entered an unsuccessful grocery business at about the time the large borrowings began which absorbed an unspecified but certainly significant sum of money. Furthermore, Drye's returns indicate the acquisition of other business assets during the period 1960 through 1964 having a total cost of at least $27,848. Drye's returns also show interest income of $830 in 1961, $1,046 in 1962, and $417 in 1963, evidencing his loans to others possibly of some of the proceeds of his bank borrowings. Although Drye claims he borrowed over $120,000 from the bank, the balance of loans outstanding in mid-1964 was only $81,300, $8,500 of which was borrowed in May of 1964, which was subsequent to the time Drye said he stopped paying the bribes to Kyler. Drye claimed that following Kyler's appointment to chief of police, the bribes were always paid on a Saturday and in Kyler's office. Notwithstanding the fact that Kyler's regular workdays while chief of police were Monday through Friday, respondent put forth no witnesses who noticed during any part of the 5 1/2-year period Kyler's presences, regular or otherwise in his office on Saturdays, or for *36 that matter Drye's presence at the station on Saturdays, even though several police officers knew Drye by sight. Drye claims the bribes were for benign treatment by the Mansfield police. Although there is no evidence of Drye's arrest in spite of the fact that Mansfield police knew of his general character, there is evidence of arrests and investigations relating to Drye's subordinates and businesses. The only testimony tending to support the notion that Kyler established and maintained a "hands-off policy" with respect to Drye is the conclusion of Douglas Hazen, a police officer under Kyler and later Mansfield's director of public safety. However, Hazen's opinion was a conclusion unsupported by any substantive evidence. Contradicting Hazen's testimony of a "hands-off policy," petitioner placed in evidence various memos from Kyler as chief of police to the officers under him emphasizing the police department's rule that captains and detectives "shall be held strictly accountable for any failure of the members of their subdivision to suppress crime, vice, and gambling." The situation here is peculiar in that the facts of the arrest of Drye's numbers runner in 1964 and Drye's financial *37 demise logically lend support at the same time to two contradictory theories; the first theory is that Drye's anger at the arrest, after promised security, led to his truthful accusation of Kyler; the alternative theory is that the shutting down of Drye's operations due to a change in police enforcement policy produced a vindictive intent on Drye's part to "get even" by any means available, including the untruthful accusation of Kyler as the recipient of bribes. The evidence of Drye's past illegal activities does not make easier the choice between the two theories. On balance and for the reasons stated above, we accept the latter theory. There remains the question of whether the admitted omissions of interest and executor's fees were the result of fraud. Mere understatement of income does not establish fraud. The existence of fraud with an intent to evade tax must be affirmatively established. (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. Although we generally view circumstantial "badges" of fraud such as substantial omissions from income repeated over a series of years as supporting an inference *38 of willfulness, , and cases cited therein, these circumstances are lacking in this case. In this case, the failure to report interest income did not persist in each of the questioned years, no interest at all being omitted from income in 1964; the failure to report the interest from savings accounts ended in 1962 even though savings account interest was earned in 1963 and 1964; and the amounts of interest omitted were small. Aside from the fact and the amounts of the omissions placed in evidence by joint stipulation, respondent has adduced no other affirmative evidence of fraudulent intent, nor does such evidence exist in the whole record. We find no clear and convincing proof of fraudulent intent to avoid taxes through the failure to report interest income. The only other item not reported was the executor's fee which, following an argument with Kyler's sister, he turned over to her two children who were also descendants of the decedent, Kyler's mother. Without further evidence we cannot conclude that the failure to report this item was not the result of a mistake as to its taxability. Finding no fraud in any of *39 the years 1958 through 1964, we conclude that the years 1324 1958 and 1959 are closed by the statute of limitations as claimed by petitioner in her amended petition. Due to petitioner's concessions with respect to the years 1960 through 1963, Decision will be entered under Rule 50.